JAMES P. WORTHEN *et al.*, Petitioners-Appellants, v. THE SECRETARY OF STATE *et al.*, Respondents-Appellees.

Fourth District   No. 4—86—0516

Opinion filed August 24, 1987.—Rehearing denied October 7, 1987.

Herman G. Bodewes and John L. Swartz, both of Giffin, Winning,

Lindner, Cohen & Bodewes, and David K. Harris, both of Springfield, for appellants.

Neil F. Hartigan, Attorney General, of Springfield (Roma Jones Stewart, Solicitor General, and Jill A. Deutsch, Assistant Attorney General, of Chicago, of counsel), for appellees.

JUSTICE LUND delivered the opinion of the court:

The plaintiffs in this appeal are 16 former employees of the Illinois Secretary of State's office (Secretary). They were laid off in 1984 when an entire division within the Secretary's office was eliminated. Plaintiffs attack this layoff as a "subterfuge" by which their employment was terminated outright based upon political affiliation. Plaintiffs also assert a failure to comply with the statutory prerequisites to a proper layoff plan as well as a violation of due process in not being afforded a full and fair hearing before the State of Illinois Merit Commission (Commission).

Plaintiffs originally brought their complaints to the Commission after receiving notice of their layoff in November 1984. At the conclusion of several weeks of hearings, the layoffs were upheld by both a hearing officer and the Commission. Plaintiffs now appeal the order of the circuit court of Sangamon County affirming the Commission's decision.

Although their arguments are variously stated, we may break down the issues raised by the plaintiffs on appeal into four separate points of contention: (1) whether the layoffs were accomplished according to the applicable provisions of the Secretary of State Merit Employment Code (Ill. Rev. Stat. 1985, ch. 124, par. 101 et seq.) and the Personnel Code and Rules (80 Ill. Adm. Code 50.10 et seq. (1985)); (2) whether the plaintiffs' rights to reemployment were violated; (3) whether the layoff plan itself, taken together with the addition of several new employees within another division of the Secretary's office, were formulated in bad faith for political reasons; and (4) whether plaintiffs' right to a full hearing on all issues raised was not complied with.

The prolix facts and testimony of record are relevant to the extent necessary to properly determine the issues raised.

Plaintiffs were previously employed in the Auto Dealer Services Division within the Vehicle Service Department of the Secretary of State's office. Their official titles were auto dealer service representatives or supervisors. Plaintiff James Worthen, apparently the divi-

sion administrator, was officially classified as administrative assistant III.

On October 22, 1984, Sam McGaw, Director of the Vehicle Services Department, submitted a layoff proposal to William Rolando, then the Acting Director of Personnel for the Secretary of State. In his memorandum explaining the layoff package, McGaw reviewed the auto dealer services program within his division and concluded a more cost-effective means of communicating with and furnishing materials to Illinois automobile dealerships was in order. Justifications for such a change in service, McGaw continued, included the lower costs associated with setting up telephone lines to provide dealerships with such services as opposed to having representatives drive from dealer to dealer within their geographic districts.

As his plan would entail elimination of the work performed by auto dealer service representatives, supervisors, and administrators, McGaw sought permission to lay off those employees. The layoff would be based "upon the material change in duties, organization, and a resultant lack of work" for employees within the Auto Dealer Services Division. The layoff package itself included a list of the certified employees within the division to be laid off, documentation of their years of continuous service, performance evaluations, the written justification for the layoffs, and organizational charts depicting the current makeup of the division. The package denoted *all* employees within this organizational unit as subject to layoff.

Acting Director of Personnel Rolando approved the layoff plan on November 2, 1984. Four days later, the affected employees were given written notice of a layoff effective at the close of the business day November 30, 1984, due to a "material change in duties/organization and a resulting lack of work."

On November 21, 1984, plaintiffs filed their individual appeals of the layoff-reorganization plan before the State of Illinois Merit Commission. In their pleadings, plaintiffs noted the establishment of 19 new positions within the newly created Financial Institutions Service Division of the Secretary's office. These additional employees, designated financial institutions field representatives (FIFRs), were hired in this capacity just prior to the notice of the plaintiffs' layoff. The duties and functions of the FIFRs, plaintiffs complained, included some of the responsibilities performed by them as auto dealer service representatives. The plaintiffs believed they should at least have been offered reassignment to those positions in advance of their layoffs. They further alleged the employees hired within the Financial Institutions Service Division were either "personal friends" of the Secre-

tary or belonged to the same political party as the Secretary. Plaintiffs, on the other hand, were active in a different political party. In sum, plaintiffs alleged their rights to reemployment were "knowingly destroyed" by the overall scheme and by the failure to provide them with proper reemployment opportunities.

The appeals were consolidated before the Commission. By letter dated March 13, 1986, the Executive Secretary of the Commission, upon a review of the pleadings, layoff plans, and personnel rosters submitted, identified three specific material issues of fact to be resolved:

"(1) What duties were actually being performed by Petitioner at and/or immediately prior to the layoff;

(2) What has been done with those duties since the layoff; and

(3) Were non-Merit factors the primary consideration for the layoff?"

The hearings began on May 24, 1985, and ran intermittently through July 12, 1985. At one point during the hearings, plaintiffs attempted to introduce evidence of 15 original applications for employment submitted by the eventual hirees in the Financial Institutions Services Division, complaining that copies actually submitted to the hearing officer contained "numerous and substantial changes, modifications, and deletions." The hearing officer, however, did not allow these original applications to be considered as evidence.

Plaintiffs also sought to introduce the certified voter registration records of the applicants indicating they were all members of the Republican party. Additionally, plaintiffs submitted for consideration lists of Republican party officials compiled by the State Board of Elections for 1984-85 which showed some of the hirees held party positions within their respective counties. Plaintiffs charged such evidence was relevant because these employees belonged to the same political party as the Secretary, Assistant Secretary of State Allen Grosboll (who implemented the layoff plan), and Acting Director of Personnel Rolando. The hearing officer, while accepting this evidence as an offer of proof, nevertheless refused to admit it. The hearing officer essentially denied all inquiry into the method of filling those positions until plaintiffs could establish some legal right or entitlement to them.

Plaintiffs on June 7, 1985, presented a motion to reconsider the hearing officer's prior ruling against inquiry into the method of hiring for the 19 new positions. Plaintiffs also argued the statement of issues tendered by the Executive Secretary of the Commission was

too limited, asserting it would be appropriate to inquire into the motive of the Secretary's office in designing the layoff plan while new positions were concurrently established in a different division. The hearing officer apparently denied that motion orally on July 1, 1985.

Much of the plaintiffs' testimony is repetitive. A basic outline of their duties and responsibilities may be gleaned from the record.

Plaintiffs were each assigned a certain geographic region, usually comprised of several counties, in which they would act as field representatives. In this capacity, they would visit driver's license facilities, car dealerships, financial institutions, auto rebuilders and wreckers. They would personally deliver license plates, vehicle stickers, and other forms. Some of their work also involved delivery to banks; one plaintiff estimated that 10% of his activities involved calling on financial institutions.

The plaintiffs also conducted numerous seminars regarding license and registration requirements. These seminars were attended by car dealers, driver's facility personnel, and remitters.

Plaintiffs testified they were heavily involved in settling title problems that arose concerning automobiles. Often they acted as a "liaison" between the Secretary of State and persons involved in over-the-counter distribution of license plates. Much of the plaintiffs' activities also involved new car dealerships. They would furnish "start-up" kits to new dealers going into service. They would also travel to new dealerships to answer any title questions.

A substantial portion of the plaintiffs' responsibilities further involved the issuance of temporary registration permits (TRPs). These permits are usually affixed to the rear window of a recently purchased vehicle and serve as registration for the vehicle until permanent license plates can be provided. Because the issuance of blank TRPs had become a problem within the Secretary's office, plaintiffs were instructed to keep logs while distributing those permits.

To a man, the plaintiffs believed their primary duties involved personally calling on dealers, driver's license facilities, and financial institutions in order to supply them with licenses and forms for over-the-counter distribution. They were also primarily involved in helping settle any registration problems the dealerships or other entities had. As such, they conducted field meetings with dealers, remitters, banks, and driver's facility personnel, indicating to them changes in the law and showing them how to handle title and registration problems. The issuance and control of TRPs was also a primary job function.

Each of the plaintiffs indicated they were registered Democrats,

many of them stating they also held positions within the party organizations of their respective counties of residence.

Several of the plaintiffs related that during mid-year meetings conducted in 1983 and 1984, Alan Grosboll, formerly the Director of Vehicle Services, assured them their jobs were secure in the face of rumors to the contrary.

Testimony indicated three former dealer service representatives are now employed in the Financial Institutions Service Division within the Accounting Revenue Department of the Secretary's office. Each of these three were contacted about, interviewed for, and transferred to the new positions prior to announcement of the layoff plan.

John Showell, one of those three, testified he currently operates in the same basic geographic territory he did when he was a dealer service representative. Showell stated he primarily performs auditing duties, although on occasion he may call on dealers and banks to answer title questions.

Paul Williams, a dealer service representative since 1973, testified he attained a new position within the Financial Institution Services Division in September of 1985. To get the new job, Williams filled out an application on August 6, 1984, and was subsequently interviewed. He considered the new assignment a "promotion."

Williams distinguished his present and former positions, testifying he no longer delivers license plates or forms. Instead, he informs auto dealers they should request such items by calling or writing the Springfield office. He does not deal with title problems now, and he no longer conducts seminars. He merely audits TRPs, license plates and stickers, activities he stated he did not perform previously. Williams testified he is a Democrat, but recently resigned as a county chairman of his party.

Charles Oelrich testified in his new position as FIFR he audits temporary registration permits as issued by remitters and auto dealers. He also audits the license plate programs. He stated he is now "forbidden" to help dealers resolve their title problems, instead instructing them to call a toll-free telephone number. The simple one-page form utilized in auditing TRPs is easy to fill out, Oelrich said.

Concerning the formulation of the layoff plan itself, the following testimony was heard:

Dave Davis, Administrator of the Administrative Division for the Vehicle Services Department, testified he was first contacted in about August of 1984 to conduct an investigation of the Auto Dealer Services Division. Alan Grosboll, then-Director of the Vehicle Services

Department, instructed Davis to approximate the program costs of the auto dealer field representatives. Davis completed a spreadsheet or chart for Grosboll in August or September. Davis was instructed not to talk to anyone about a possible layoff at that point.

Alan Grosboll, formerly the Director of Vehicle Services and presently Assistant Secretary of State, testified the layoff was basically his decision. Upon being named Director of Vehicle Services in February of 1981, Grosboll stated he immediately recognized "some inefficiencies" in the dealer services representative program which needed to be rectified. He felt there had to be "some cheaper way" of disseminating information to dealerships in lieu of sending 34 people out into the field. He also noted during his tenure as Director of Vehicle Services that when positions became vacant within the division, "they remained vacant."

In contacting Division in the early fall of 1984, Grosboll wanted to see definite fiscal statements regarding the cost of the dealer service representative program and what savings could be realized if the program was revised or eliminated. Grosboll testified when he first asked Davis to prepare additional figures, he had not at that time made any definite decision regarding a layoff.

After receiving documentation of the possible savings, Grosboll began putting a layoff plan together. At that time, he also contemplated how to substitute for those services. No written plan or report was ever put together regarding the projected costs of alternate services.

Grosboll understood the plaintiffs' general job duties to be the distribution of license plates, forms, and applications, and the fielding of procedural questions that would arise. The plaintiffs would also conduct informational or public relations seminars. Grosboll testified plaintiffs were providing valuable services, and the adequacy of their job performance had nothing to do with the layoff decision. He believed alternate services could be best furnished by distributing toll-free telephone numbers for dealerships to utilize if they had license questions or if they needed to request forms or plates. The decision was also made to utilize the United Parcel Service to mail out plates, forms and permits upon request instead of having service representatives drive from dealership to dealership delivering them.

Grosboll believed the layoff package "made sense economically," as elimination of the dealer services program would save the Department some $750,000. He testified politics played no role in his decision to implement the layoff. Grosboll was also not aware of any intent to use the new FIFR personnel to perform any of the auto

dealer service representatives' former duties.

JoAnn Wilson, who oversees the Appointment Section within the Secretary's Department of Personnel, testified regarding reemployment lists. She explained a laid-off employee has a right to a "position in that title and in that Department in the County in which they were laid off for a period of one year from the date of the layoff." When placed on a reemployment list, a laid-off employee has the right of refusal to employment where a vacancy occurs in a similar position. Reemployment lists are prepared from information concerning layoffs submitted by the Technical Services Division; that information is received after layoffs are initiated, she stated.

Wilson testified that plaintiffs were placed on a reemployment list dated December 5, 1984. Under that list, they were entitled to reemployment only as an auto dealer service representative within the Department of Vehicle Services in that county in which they resided. A decision was later made that because those positions had been effectively abolished, plaintiffs would never be entitled to reemployment under those titles. As of January 1985, plaintiffs' reemployment designation on the list was changed to either administrative assistant II (AA II) or administrative assistant III (AA III) within the Vehicle Services Department of their respective residence counties only. This gave the laid-off employees the right of first refusal if an AA II or AA III position became open within that Department of Vehicle Services in their county only, not in different counties.

Some testimony was also heard concerning the hiring of employees for the new positions within the Financial Institutions Service Division.

Roger Hickman, director of the Accounting Revenue Department, of which the Financial Institutions Service Division is a part, testified training seminars were first held for the new employees in September of 1984. Their initial job duties included the auditing of forms forwarded from banks, savings and loan associations, currency exchanges, driver's license facilities, and remitters. They now also audit forms from car dealers, as they are heavily involved with the auditing of TRPs.

Steven Babb, assistant administrator for the Financial Institutions Sales Department, Department of Accounting Services, testified that prior to June 1984 a decision was made to initiate a program which would provide accountability for temporary registration permits and cash receipts within the driver's service facilities. After numerous meetings with Roger Hickman and Mitchell Murdock, Director of the Department of Accounting Revenue, he prepared drafts of

job descriptions for 14 or 15 new positions. Initially, those duties involved the auditing of all motor vehicle transactions, including the issuance of TRPs. The program was later enhanced to include auditing of auto dealers and remittance agents.

Mitchell Murdock testified he requested 14 or 15 new positions in the summer of 1984. Primary justifications in establishing the new positions included auditing of dealers or remitters who issued TRPs as well as to audit of financial institutions regarding over-the-counter sales. While prior auditing experience was not necessary for the job, it was also considered "helpful." Those who interviewed for the positions would have been on an employment list within the Department of Personnel; some of them would have already held positions with the Secretary's office when they were interviewed and hired. The residence county of the applicant was also an important consideration in the hiring decision, particularly if that county corresponded with the work county or the job or was a central county within a designated geographic working boundary.

At the conclusion of the hearings, the hearing officer memorialized his findings of fact and conclusions of law upholding the layoff plan in a 68-page memorandum of decision issued September 20, 1985. The hearing officer concluded the plaintiffs' former duties primarily consisted of handling title and registration problems, delivering plates and forms, and conducting seminars, and these duties were currently being handled by mail, UPS, and telephone. The hearing officer also wrote that "the change in the manner of providing services to the automobile dealers of the State of Illinois is a material change in duties and/or organization within the Department of Vehicle Services, and that is legal cause for a layoff." Regarding reemployment lists, the hearing officer believed plaintiffs should have been placed on a list originally entitling them to reemployment in every county in which they were assigned to or worked in prior to layoff rather than strictly according to their county of residence. However, the fact that the reemployment lists may have been erroneously prepared did not mandate reinstatement of plaintiffs' employment, the hearing officer found. In sum, the hearing officer stated no evidence had been presented that any new employee was hired in violation of plaintiffs' reemployment rights or that any plaintiff had a right to a position already filled.

The Commission adopted the findings of the hearing officer on October 8, 1985. While the Commission recognized "technical violations" in placing plaintiffs on the reemployment lists by their residence county only, the Commission concluded this error did not affect

plaintiffs' rights to reemployment, and they were not entitled to reinstatement.

Plaintiffs filed their complaint for administrative review in the circuit court of Sangamon County on October 22, 1985. On July 2, 1986, the circuit court allowed plaintiffs' motion to produce originals of the new employees' applications. By docket entry dated that same day, the court also affirmed the decision of the Merit Commission, and the plaintiffs have appealed.

With our recitation of the pertinent factual testimony out of the way, we may begin our consideration of the substantive issues raised by restating some basic concepts. The Administrative Review Law provides in part that agency findings and conclusions on questions of fact are *prima facie* true and correct. (Ill. Rev. Stat. 1985, ch. 110, par. 3—110.) No court may interfere with the discretionary authority vested in an administrative body unless that authority is exercised in an arbitrary or capricious manner, or the administrative decision is contrary to the manifest weight of the evidence (*Murdy v. Edgar* (1984), 103 Ill. 2d 384, 469 N.E.2d 1085), a determination which may arise where an opposite conclusion is clearly apparent from the record (*Madonia v. Houston* (1984), 125 Ill. App. 3d 713, 466 N.E.2d 648). Still, courts of review are not necessarily bound by an agency's interpretation of law. *Board of Education of Plainfield Community Consolidated School District No. 202 v. Illinois Educational Labor Relations Board* (1986), 143 Ill. App. 3d 898, 907, 493 N.E.2d 1130, 1136.

In a nutshell, from the evidence and testimony of record previously summarized, plaintiffs as auto dealer service representatives delivered plates, forms, and permits to various entities within their geographic area of responsibility. They would travel in their area of field operations, sometimes encompassing several counties, to make personal calls on automobile dealerships, driver's license facilities, financial institutions, and remitters. They would answer title and registration questions. They were heavily involved in the temporary registration permit program and kept logs as to their issuance. They also conducted informational seminars. All plaintiffs admitted affiliation with the Democratic party.

It seems clear from the record and testimony that, although there is some slight overlap in services formerly performed by auto dealers service representatives and those presently conducted by financial institutions field representatives—specifically, the auditing of TRPs—their duties nevertheless appear substantially dissimilar. The FIFRs do not handle title problems or other questions, do not drive

around their districts supplying licenses and forms, and do not conduct seminars. Those services formerly rendered by auto dealers service representatives are now provided through the use of the mails and toll-free telephone numbers. We note a simplified, standardized form is utilized by FIFRs in auditing temporary registration permits. From the testimony it was an easy matter to teach or train workers to use this form in auditing permits, and the plaintiffs, given their former background in auto dealer service, would have been as competent as anyone to perform that task. This does not necessarily mean plaintiffs had to be hired in the new positions. Up to this point, we agree with the factual determinations made by the hearing officer and the Merit Commission.

We believe, however, plaintiffs have presented a valid point under due process analysis. The Executive Secretary's statement of the three specific issues to be resolved by the hearing is too narrow and did not provide the plaintiffs with a proper opportunity to prove their case. The hearing officer's related rulings denying introduction of the hirees' active political affiliation and employment applications further contributed to an unduly restrictive hearing of the complaints raised.

Meeting to discuss the establishment of positions within a newly created branch, the Financial Institutions Services Division, were apparently conducted during the late summer of 1984. That division was set up within the Accounting Revenue Department; plaintiffs were formerly employed in another division within a separate department (Vehicle Services). Applications were taken and interviews held to fill several new positions during the summer and fall of 1984. Seminars to train the new employees were held in September. Dave Davis, who initially put together a study and chart of the auto dealer services program at the request of Grosboll, believed 19 new FIFR employee positions were firmly established as of October 1984. Davis also stated Grosboll instructed him to conduct the survey or investigation of the Auto Dealer Services Division in August or September of 1984. The time span between application, interview, and filling of the new positions can best be estimated to run from August through October of 1984. The actual layoff package within the Auto Dealers Services Division was presented during November of 1984, with the layoffs effective later that month. The development of these two plans can at least be considered fairly proximate in time, if not concurrent.

Suffice it to say that the timing involved in effectuating layoffs within one division while hiring new employees in another division is

somewhat curious. We believe there should have been greater inquiry into the time frame of these personnel adjustments. Granted, the layoffs and hirings occurred within two different departments of the Secretary's office. Plaintiffs still have charged that all the new employees hired were of one political party, while they were of another party. Any attempt to show political affiliation were rebuked by the hearing officer. Inquiry into the application procedure and hiring process of the FIFRs was also cut short.

■ Administrative proceedings must be governed by the fundamental principles and requirements of due process of law (*Ellis v. Illinois Commerce Com.* (1970), 44 Ill. 2d 438, 255 N.E.2d 417), which contemplates a full, fair, and impartial hearing be held (*Mills v. Ehler* (1950), 407 Ill. 602, 95 N.E.2d 848). The findings of an administrative agency will be upheld based on the evidence presented so long as all parties are given the opportunity to fully cross-examine witnesses, inspect documents, and present all relevant evidence. (*Saleson v. Department of Registration & Education* (1968), 95 Ill. App. 2d 104, 237 N.E.2d 822.) By limiting the issue under consideration where the timing aspect of these personnel moves was suspect, the Commission failed to give the plaintiffs a fair opportunity to submit evidence, fully develop their case, and present a legitimate claim of entitlement to continued employment safeguarded by due process guarantees. Accordingly, we must remand this matter to the Commission for further proceedings.

■ Defendants nevertheless maintain on appeal only the propriety of a layoff plan is at issue, depicting the hiring practices within the Secretary's office as a separate, unrelated concern not subject to inquiry. Defendants therefore believe the considerations which go into hiring other employees to fill different positions are irrelevant to a determination of whether a subsequent layoff plan was proper. We cannot agree with such contentions under the circumstances of the hirings and layoffs here, where the plaintiffs have raised the question of motivation and where they have been precluded from a full hearing concerning their allegations.

Our conclusion does not mean plaintiffs have an easy task ahead of them. It is certainly true that employee positions may be abolished for reasons of economy and efficiency or as part of a material reorganization. The Secretary normally has the right to dispense with certain services it deems too expensive, and to act accordingly to provide more efficient services. Parties attacking any such layoff or abolition as improper, to prevail, bear the burden of establishing bad faith. Annot., 87 A.L.R.3d 1165, 1177 (1978).

Plaintiffs will undoubtedly offer documentation of political affiliation in an attempt to establish such bad faith. However, it has been held that the existence of political motivation alone is not such evidence of bad faith to void an otherwise valid and legal discharge or layoff. (*Chestnut v. Lodge* (1966), 77 Ill. App. 2d 281, 288, 222 N.E.2d 36, 40.) Proof of political motive, without more, may be insufficient to overcome the existing presumption that an abolition of a position is made in good faith instead. 77 Ill. App. 2d 281, 288-89, 222 N.E.2d 36, 40; see also *Phipps v. Civil Service Com.* (1983), 112 Ill. App. 3d 1093, 445 N.E.2d 75.

Because we reverse and remand on the basis of a lack of a full hearing under due process of law, we need not decide this case on the other issues raised. Inasmuch as the matter will continue before the Commission, though, we deem it provident to make some additional comments.

The recognized general rule is that abolition of employment subject to civil service or merit system is presumed proper, notwithstanding statutory requirements, if accomplished in good faith. (Annot., 87 A.L.R.3d 1165, 1169 (1978).) Lack of good faith may be established by the fact of a subterfuge or pretended abolition of positions, lack of economic justification for the abolition, or, to a lesser extent, political motivation. Good faith, on the other hand, may be established upon a showing that the abolition was part of a reorganization to further economy and efficiency, and was accomplished in compliance with code or statute. Annot., 87 A.L.R.3d 1165, 1177 (1978).

Plaintiffs complain they were "discharged" in bad faith when statutory layoff procedures and requirements were not met.

Section 10b.13 of the Secretary of State Merit Employment Code (Code) (Ill. Rev. Stat. 1985, ch. 124, par. 110b.13) provides an employee may be laid off for any or all of the following reasons: lack of funds or work, abolition of a position, or a material change in duties. Any certified employee who believes a personnel transaction was used as a "subterfuge for discharge" may appeal that decision in writing to the Commission. (Ill. Rev. Stat. 1985, ch. 124, par. 109a.) An appeal must allege specific facts which, if proven, would establish a *prima facie* case that the employee was effectively discharged contrary to any provision of the Code. Ill. Rev. Stat. 1985, ch. 124, par. 109a.

Under the Personnel Code and Rules (Personnel Rules) any certified employee who has been laid off, or believes a personnel transaction has been "falsely labeled," or who maintains that a Code or Per-

sonnel Rule has been violated, may appeal in writing to the Commission. (80 Ill. Adm. Code 50.90(a), 50.100(a) (1985).) The burden of proof in all layoff hearings is on the employee to show a violation of the Code or Personnel Rules. 80 Ill. Adm. Code 50.90(d) (1985).

The Personnel Rules were adopted under the authority of the Commission to carry out and implement its powers and duties (Ill. Rev. Stat. 1985, ch. 124, par. 108c(11)). The Rules set forth the precise procedure by which the Secretary may institute a layoff. The pertinent Rule provides in part that any department may request a layoff due to lack of funds, material change in duties and organization, or lack of work. (80 Ill. Adm. Code 420.280(a)(2) (1985).) Any proposed layoff must be submitted to the Director of the Department of Personnel for approval prior to implementation. The layoff must include a list of all employees within the organizational unit, those employees to be laid off, performance records of all affected employees, and an explanation of the layoff by the department director. 80 Ill. Adm. Code 420.280(a)(2) (1985).

The cited reasons for the layoffs here were a material change in duties or organization and a resultant lack of work, bringing it within the enumerated rationale for a layoff request. (80 Ill. Adm. Code 420.280 (1985); see also Ill. Rev. Stat. 1985, ch. 124, par. 110b.13.) Pursuant to the Personnel Rules, a layoff plan was submitted to the Director of Personnel. Explanation for the layoff was provided by memorandum. Included within the layoff package as submitted was a list of all certified employees subject to layoff, their continuous dates of service, employee titles, individual evaluations, organizational charts within the division, and a formal written justification. The proposal was then approved by the Director of Personnel.

It is therefore apparent this portion of the layoff procedure was in compliance with the statutory prerequisites, although standardized evaluation forms entitled "individual performance and development system" were included as opposed to the annual performance records specifically called for under section 420.280 of the Personnel Rules. (80 Ill. Adm. Code 420.280(a)(2)(C); see also 80 Ill. Adm. Code 420.255 (1985).) Inasmuch as all employees within the organizational unit were subject to layoff, the lack of recent annual performance records would not necessarily invalidate the entire package.

■ Plaintiffs dispute the economic justification and claimed $750,000 savings in eliminating the dealer representatives service, pointing to the additional costs incurred in hiring 19 new employees and in distributing materials by UPS or by the mails. They allege a mere paper movement of funds from division to division, although

they offer no substantiation for this claim.

The economic justifications in providing services through a more efficient means appear valid. The telephone and mails would be utilized instead of requiring representatives to drive throughout their district delivering materials and answering questions. Even were a substantial amount of money spent under the new Financial Institutions Services Division program, this does not necessarily establish bad faith. There is a difference between a program initiated to "economize" and one to "save." The Secretary is within his rights to abolish a program considered unnecessary and outmoded in favor of more efficient methods of getting materials out without being guilty of bad faith.

■ Plaintiffs next complain an investigation was not conducted by the Commission as required according to section 50.90 of the Personnel Rules where a certified employee appeals a layoff. (80 Ill. Adm. Code 50.90(b) (1985).) However, section 9a of the Code regarding appeals where an employee believes a personnel transaction has been utilized as a subterfuge for discharge provides that the Commission "in due exercise of its discretion may make its decision on the appeal after an investigation of the allegations *or* [upon ordering] a hearing held on any disputed issues of fact or law." (Emphasis added.) (Ill. Rev. Stat. 1985, ch. 124, par. 109a.) The Commission clearly instituted the latter of the two discretionary alternatives.

■ Finally, plaintiffs raise the lack of effective placement on reemployment lists. The applicable provision concerning reemployment lists after a layoff reads in pertinent part: "The Department of Personnel shall establish and maintain a reemployment list, by class and department and county, or other designated geographical area approved by the Director of Personnel before layoff." (80 Ill. Adm. Code 420.280(e)(1) (1985).) The Personnel Rules further state: "A certified employee who has been laid off shall be placed *** on a reemployment list *** [within] the department and county or other designated geographical location or area in which the employee was [previously] assigned ***." 80 Ill. Adm. Code 420.280(e)(1) (1985).

Plaintiffs were first placed on reemployment lists under their old job titles within their counties of residence only, even though many of them were previously responsible for multicounty districts. They were later replaced on reemployment lists under different titular classifications, but still within their residence counties only. The Merit Commission termed this a "technical violation" of the Rules.

Lack of overall compliance with the literal requirements of the reemployment list provisions may best be presented by the plaintiffs

before the Commission in relation to the timing issues. Should the plaintiffs meet their burden of proving the overall effect of the layoff and re-employment list designation was the evisceration of any viable reemployment opportunity, and that effect was occasioned by reasons of bad faith and political motivation, plaintiffs would be entitled to relief.

We reverse and remand to the State of Illinois Merit Commission for further proceedings consistent with this opinion.

Reversed and remanded.

SPITZ, P.J., and KNECHT, J., concur.